UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT WAYNE
ANNABEL, II,

               Plaintiff,

v.

JACKSON COUNTY
SHERIFF DEPARTMENT,
*et al.*,

               Defendants.

_____/

Case No. 2:22-cv-12189
District Judge Laurie J. Michelson
Magistrate Judge Anthony P. Patti

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO GRANT THE JACKSON COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 105)

**I.     RECOMMENDATION**:  The Court should **GRANT** the Jackson County

Defendants' motion for summary judgment (ECF No. 105).

**II.     REPORT**

    **A.     Introduction**

Robert Wayne Annabel, II is currently located at the Michigan Department

of Corrections (MDOC) Macomb Correctional Facility (MRF), where he is serving

a life sentence imposed on May 15, 2024, for a May 23, 2022 offense.  *See*

www.michigan.gov/corrections, "Offender Search," last visited Aug. 26, 2025;

*People v. Annabel*, Case No. 2022-704-FC (Jackson County); ECF No. 41-2

(Register of Actions). Admittedly, he has filed multiple lawsuits while incarcerated. (ECF No. 1, PageID.2 ¶ 2; ECF No. 96, ¶ 2.)

In September 2022, while located at MRF, Annabel initiated this lawsuit, which stems from his alleged May 23, 2022 arrest – at which time he "was in a six-bedroom house designated for parolees[,]" (ECF No. 45, PageID.402 ¶ 1) – and subsequent alleged events at the Jackson County Jail (JCJ). (ECF No. 1, ¶¶ 13-23.) The currently operative pleading is Plaintiff's December 27, 2024 amended, verified complaint (ECF No. 96), which: (1) names six Defendants – *i.e.*, Sheriff Gary Schuette, Deputy Sheriff Ryan Steverson, Deputy Sheriff Jacob Sibson, Deputy Sheriff Matthew Wetmore, and Sergeant Pedro Peraza ("the Jackson County Defendants"), and clinician Sara Daniels (of Lifeways, Inc.) – each sued in his or her "official and individual capacities[,]" (*id.*, ¶¶ 5-11); (2) contains an expanded statement of facts (*id.*, ¶¶ 12-39); (3) lists claims based on the Fourteenth Amendment, the Americans with Disabilities Act (ADA), and state law (*id.*, ¶¶ 40-46); and, (4) seeks declaratory, injunctive, compensatory, and punitive relief, as well as costs and attorney fees (*id.*, PageID.1078-1080 ¶¶ a-l).

## B. Instant Matter

Judge Michelson has referred this case to me for pretrial matters. (ECF No. 20.) Currently before the Court is the Jackson County Defendants' December 27, 2024 motion for summary judgment (ECF No. 105), as to which Plaintiff has filed

a response (ECF No. 111), and the Jackson County Defendants have filed a reply (ECF No. 114).

The Court entered several orders related to the filing of video exhibits. (*See* May 7, 2025 Text-Only Order; May 26, 2025 Text-Only Order; ECF Nos. 122, 123, 125.) On June 26, 2025, Exhibits 7-17 were uploaded to SharePoint (*see* Media File Upload - Home). (*See also* ECF No. 111, PageID.1333-1334.) Now this motion is ready for decision.[1]

## C.    Fed. R. Civ. P. 56

The Jackson County Defendants seek relief pursuant to Federal Rule of Civil Procedure 56. (ECF No. 105, PageID.1128, 1139-1140.) Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

---

[1] Lifeways, Inc. Defendant Daniels's July 25, 2025 motion for summary judgment (ECF No. 126), regarding which Plaintiff timely filed a response on August 20, 2025 (ECF Nos. 127, 128), will be addressed under separate cover.

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion.").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . .   [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).  Moreover, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006) (internal quotations and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The fact that Plaintiff is *pro se* does not lessen his obligations under Rule 56. Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006). In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a pro se litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming

grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion").

### D.     Discussion

Preliminarily, the Court makes several observations about Plaintiff's first argument in his March 10, 2025 response – *i.e.*, defense counsel should be held in contempt and/or sanctioned for "misrepresenting the factual record and for manipulative omissions in their motion for summary judgment."  (*See* ECF No. 111, PageID.1277-1278.)  First, the Court's October 10, 2024 text-only show cause order and May 7, 2025 text-only order address Plaintiff's October 2024 "motion for order of show cause . . ." (ECF No. 81), January 2025 "petition for ruling on motion for contempt and/or sanctions" (ECF No. 99), and April 2025 "second motion for contempt and/or sanctions . . ." (ECF No. 118).  Second, to the extent Plaintiff's March 10, 2025 response seeks contempt and/or sanctions, it should not have been embedded in a motion response.  *See* Fed. R. Civ. P. 11(c)(2); E.D. Mich. LR 5.1(e)(1), E.D. Mich. LR 7.1(i); and E.D. Mich. Electronic Filing Policies and Procedures R5(f).  Finally, to the extent Plaintiff's contempt and/or sanctions argument in his March 10, 2025 response disputes a statement within Defendants' February 21, 2025 motion as a lie, misrepresentation, false accusation, etc. (*see, e.g.,* ECF No. 111, PageID.1278), Plaintiff's responsive argument is his opportunity to challenge the movants' representations, *e.g.*, that Plaintiff "admitted

that he punched Steverson in the head," (*see* ECF No. 105, PageID.1146), or

"admitted assault on Deputy Steverson . . . [,]" (*id*., PageID.1154).

### 1.   Plaintiff's factual allegations

#### a.   May 23, 2022 – May 24, 2022

The events underlying Plaintiff's complaint span a one-week period.

Plaintiff alleges he was arrested on the morning of Monday, May 23, 2022,

seemingly at an MDOC parole house.  (ECF No. 96, ¶ 13.)  He "was taken into

booking at the County Jail . . . [,]" where he informed non-parties Sgt. Gregg

Conoly and Derick Rodgers of his bipolar disorder and PTSD, as well as his need

for "medication and an isolation cell . . . ."  (*Id*., ¶ 15.)[2]  From 10:16 a.m. to 10:34

a.m., Plaintiff "was only allowed to speak over the phone to jail clinician Sara

Daniels of Lifeways, Inc.[,]" (*id*., ¶ 16), who is a defendant in this matter, although

she is not a movant in the instant motion.

Plaintiff alleges that, on Tuesday, May 24, 2022, he voluntarily turned over

to non-party Captain Stewart a piece of metal and a U-bolt that he had broken from

a floor restraint anchor in isolation cell 1-D, explaining that he "had used it to

scratch himself to induce endorphins, dopamine and serotonin to compensate for

---

[2] Copies of non-party Officer Rogers's May 23, 2022 11:00 & 16:00 Jail Incident Reports are attached to Plaintiff's response.  (*See* ECF No. 111, PageID.1307, 1308.)

being denied medication while on suicide watch."  (ECF No. 96, ¶ 20.)  (*See also*

ECF No. 111-1, PageID.1402-1404 [non-party Stewart's email].)[3]

### b.   May 25, 2022

Plaintiff alleges that, on Wednesday, May 25, 2022, at approximately 1:00

a.m., Defendants Peraza, Steverson, Sibson, and Wetmore woke him from his sleep

for "a routine cell cleaning . . . [,]" contrary to non-party Stewart's email directing

that Plaintiff's movement "should take place on day, unless emergent

circumstances arise."  (ECF No. 96, ¶ 21; ECF No. 111-1, PageID.1402.)  Plaintiff

alleges that Defendants "took photos of [his] scratch marks . . . and what they

claim was a photo of the second piece of metal."  (ECF No. 96, ¶ 22.)  *See also*

ECF No. 111-1, PageID.1406-1408 (Photographs); ECF No. 111, PageID.1355

(Steverson's Answer to Request for Admission No. 1), 1411 (Schuette's Answer to

Request for Admission No. 1).

Plaintiff alleges that Defendants "harassed" him and "forced him into cell 1-

E, next to a loud-slamming automatic closing door in the hallway and a noisy,

high-traffic area intended to aggr[a]vate his mental illness."  (ECF No. 96, ¶ 24.)

When Plaintiff "requested return to the quiet isolation cell, they said they did not

care that the sudden loud noises made him jump or that he needed sleep, and told

---

[3] A copy of Defendant Peraza's May 24, 2022 23:30 Jail Incident Report is
attached to Plaintiff's response.  (ECF No. 111, PageID.1309.)

him to deal with it." (*Id*.)  According to Plaintiff, he was not given a mattress.

(*Id*.)  Plaintiff further alleges that Defendants "responded to Plaintiff mule-kicking

the reinforced steel door by stripping him naked[,]" and that, when Plaintiff

continued to kick the door, "at 01:13 hours they decided to place him in a restraint

chair and left him naked in cell 1-E."  (ECF No. 96, ¶ 26.)  (*See also* ECF No. 111-

1, PageID.1383-1384 ¶ 3 [Plaintiff's Declaration].)

　　　　Plaintiff alleges he was released from the restraint chair at 03:21 hours,

specifically alleging:

> It was far more humiliating to be stripped naked by aggressor male
> defendants than it was to be seen naked by female deputy Ca'Tina
> Lewis at 03:21 hours, when defendants released him from the restraint
> chair.  After Plaintiff shoved Steverson away and the Defendants
> tackled him, he was crying for them to stop harassing and abusing
> him.  The humiliating footage was published to male and female
> attorneys in a dismissed prosecution of behavior deputies provoked.

(ECF No. 96, ¶ 27.)[4]  Plaintiff alleges that he "was crying [terrified] when

defendants charged into the cell with taser drawn, and he [cowered] at the rear of

the cell from them, by no means the verbally threatening person they claimed."

(*Id*., ¶ 30.)  (*See also* SharePoint, Exhibit 7 [Steverson Body Worn Camera (BWC)

---

[4] It appears Plaintiff was charged with assault of a prison employee (Mich. Comp.
Laws § 750.197C-A), but the charges were eventually dismissed on May 15, 2024.
*See* Case No. 2022-795 (Jackson County).  *See also* ECF No. 41-1 [Register of
Actions]; ECF No. 111-1 [Aug. 22, 2022 Probable Cause Hearing]; ECF No. 111-1
[Dec. 13, 2022 Pretrial Hearing]; ECF No. 111-1 [Mar. 11, 2024 trial transcript];
ECF No. 111-1 [Mar. 14, 2024 trial transcript].

May 25, 2022 from 03:20:49 to 03:23:09].)  According to non-party Deputy Kirk

D. Crater's report, he responded to the jail at 04:02 a.m., made contact with

Defendant Steverson, and then made contact with Plaintiff in Cell 1-E.  (ECF No.

111-1, PageID.1371-1372.)

Plaintiff declares he was "placed in the restraint chair . . . again at 4:30

a.m.[,]" (*id*., PageID.1383-1384 ¶ 3), and alleges that, "[a]t 04:38 hours to 04:41

hours" he requested that Defendants "move the restraint chair back to isolation cell

1-D[,]" "his request was denied," and "he was left in cell 1-E still naked."  (ECF

No. 96, ¶ 31.)  (*See also* SharePoint, Exhibit 9 [Steverson BWC May 25, 2022

from 04:36:29 to 04:39:43]; & SharePoint, Exhibit 8 [Steverson BWC May 25,

2022 from 04:39:45 to 04:41:31]).  Plaintiff alleges he was assessed – presumably

by non-moving Defendant Daniels – from 10:34 a.m. to 11:04 a.m.  (*Id*., ¶ 17.)[5]

### c.    May 27, 2022 – May 29, 2022

Plaintiff alleges that, on Friday, May 27, 2022, the 12th District Court "held a

hearing on [non-party] Jail Captain Stewart's testimony and petition that the Jail

could not reasonably accommodate Plaintiff's mental health needs and requested

transfer to MDOC[,]" and the judge "granted the petition."  (*Id*., ¶ 35.)  Plaintiff

---

[5] The record also contains copies of May 25, 2022 Jail Incident Reports from non-party Officers West and Golightly (ECF No. 111, PageID.1318-1319), as well as a May 26, 2022 Jail Incident Report from non-party Officer Abbey (*id*., PageID.1320).

alleges he was not "referred to a psychiatrist to prescribe medication until [Saturday,] May 28, 2022." (*Id.*, ¶ 17.)

On or about Sunday, May 29, 2022, Plaintiff was transferred to the MDOC. (*Id.*, ¶ 38.)

### 2.   Fourteenth Amendment

#### a.   Excessive force

Plaintiff's Fourteenth Amendment claims are multi-faceted.  First, he alleges that Defendants used excessive force.  (ECF No. 96, ¶ 41.)  The Supreme Court has opined that "courts must use an objective standard[,]" when deciding "whether the force deliberately used is, constitutionally speaking, 'excessive[.]'"  *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015).  "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-397.  Plaintiff alleges that "all defendants' actions were objectively unreasonable." (ECF No. 96, ¶ 41.)

In their motion, the Jackson County Defendants rely extensively on *Kingsley*, as well as other cases, and use Plaintiff's deposition testimony to support the argument that they are entitled to dismissal of Plaintiff's excessive force claim against them.  (*See* ECF No. 105, PageID.1142-1147.)  At his deposition, Plaintiff testified about his claim of excessive force.  (ECF No. 105-1, PageID.1192-1196 [pp. 111-126].)  Notably, when Plaintiff was asked, "[a]s far as excessive force, it's

the fact that he participated in placing you into a chair, not the manner that he placed you in the chair[,]" he answered, "Correct." (ECF No. 105-1, PageID.1195 [p. 121].) (*See also id*., PageID.1193 [pp. 115, 116], 1194 [p. 118].) Also, when Plaintiff was asked, "[i]t's the fact that [Steverson] drew his taser and you thought that he didn't need to, fair[,]" he answered, "Exactly." (ECF No. 105-1, PageID.1193 [p. 116].) Plaintiff also testified that Steverson threatened to use a taser on him but admitted that Steverson "didn't actually deploy the prongs or the stunner[.]" (*Id*. [pp. 116, 117].)

### i.     First placement in the restraint chair

In an interrogatory response, Steverson states:  "Plaintiff's behavior in this instance – removing pieces of the jail cell floor to self-harm and cut his legs and arms – required jail staff to clear and clean Plaintiff's cell for his own health and safety." (ECF No. 111, PageID.1297.) (*See also id*., PageID.1309, 1310.) Plaintiff alleges he was harassed and forced into Cell 1-E, denied return to the quiet isolation cell, not given a mattress, stripped naked (in response to Plaintiff mule-kicking the door), placed in a restraint chair from 01:13 a.m. to 03:21 a.m., and tackled (after Plaintiff shoved Steverson). (ECF No. 96, ¶¶ 24, 26, 27.) The Court further notes the evidence that:

- Plaintiff was kicking the door (*see* ECF No. 96, ¶ 26 [Amended Complaint]; ECF No. 105-1, PageID.1184-1186, 1193-1194 [Plaintiff's Deposition]; ECF No. 111, PageID.1310 [Steverson Jail Incident Report], 1311 [Peraza Jail Incident Report]), which

Peraza and Wetmore have listed as the reason for which Plaintiff was "placed in the restraint chair . . . [,]" or the "[r]estraint chair [was] used[,]" around 01:00 on May 25, 2022 (*see* ECF No. 111, PageID.1322-1325 [Use of Force Reports]).

- When Plaintiff was released from the restraint chair – seemingly at 03:21 – he shoved or pushed or punched Steverson. (*See* ECF No. 96, ¶ 27 [Amended Complaint]; ECF No. 105-1, PageID.1184-1185 [Plaintiff's Deposition]; ECF No. 111, PageID.1312 [Steverson Jail Incident Report]; PageID.1313 [Peraza Jail Incident Report]; PageID.1315 [Wetmore Jail Incident Report]; PageID.1317 [Sibson's Jail Incident Report]; ECF No. 111-1, PageID.1327 [Peraza Use of Force Report], 1329 [Steverson Use of Force Report], ECF No. 111-1, PageID.1383 ¶ 1 [Plaintiff's Declaration], 1388 [Defendants' Interrogatory Answer].)[6]

- "Once the chair was removed from the cell Deputy Wetmore and Sergeant Peraza placed Annabel face down in the cell, and he was given loud verbal commands not to move. Deputy Wetmore exited the cell, and then [Steverson] drew [his] Taser and Sergeant Peraza and [Steverson] were also able to exit the cell." (ECF No. 111, PageID.1312 [Steverson Jail Incident Report]; *see also id*., PageID.1313 [Peraza Jail Incident Report]; PageID.1315 [Wetmore Jail Incident Report]; PageID.1316 [Peraza's Jail Incident Report], 1317 [Sibson's Jail Incident Report].)

Plaintiff argues that Steverson, Peraza, Wetmore, and Sibson "used excessive force and were deliberately indifferent to [his] mental health needs when they harassed him and used sleep deprivation tactics at 1:00 a.m., on May 25, 2022." (ECF No. 111, PageID.1279-1283.) Plaintiff alleges that Peraza and Steverson "filed false

---

[6] The record also contains a copy of a May 25, 2022 Jail Incident Report from non-party Officer Lewis. (ECF No. 111, PageID.1314.)

Jail Incident Reports," reflecting that, "during this routine cell cleaning," Peraza "entered cell 1-D and found a 'second piece of metal' and that Plaintiff had again been scratching himself with it." (ECF No. 96, ¶ 22; ECF No. 111, PageID.1309, 1310.) Plaintiff also alleges that Peraza's Jail Incident Report "falsely claims the suicide prevention gown was placed over Plaintiff while restrained." (ECF No. 96, ¶ 26; *see also id*., ¶ 27; ECF No. 111, PageID.1316.)

Whatever the cause was for his transfer from Cell 1-D to Cell 1-E, and whether or not Defendants covered Plaintiff with a suicide prevention gown, the Undersigned has viewed: (i) what appears to be the relevant video of Plaintiff's being placed into the restraint chair (SharePoint Exhibit 12 [West BWC], SharePoint Exhibit 13 [CCTV 1-D]);[7] (ii) Steverson's BWC dated May 25, 2022 from 03:20:49 to 03:23:09 (SharePoint Exhibit 7); and, (iii) the corresponding CCTV from Cell 1-E (SharePoint Exhibit 10). The Undersigned finds no indication that the force used was excessive or unreasonable. *See Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) ("In such a case—'where the police dash-cam video[s] ... depict[ ] all of the genuinely disputed facts,'—we 'view [ ] the facts in the light depicted by the videotape[s].'") (citations omitted). *See also Grinter v. Knight*, 532 F.3d 567, 573–74 (6th Cir. 2008) ("The use of the four-

---

[7] Other video exhibits appear to show subsequent examination of Annabel by medical staff. (SharePoint Exhibit 14 [CCTV 1-D], SharePoint Exhibit 15 [West BWC].)

point restraints and conditions in which they were administered—the four-hour

duration of the period of restraint and the fastening of the restraints without a nurse

present—were expected adverse consequences of confinement.  Grinter had been

accused of hitting a prison guard, Knight, at the time he was placed in the

restraints.  Furthermore, prison officials entered his cell to conduct an

investigation.").

### ii.      Second placement in the restraint chair

Plaintiff alleges that he "was crying terr[i]fied when defendants charged into

the cell with taser drawn," and Plaintiff "[cowered] at the rear of the cell from

them, by no means the verbally threatening person they claimed[,]" (ECF No. 96, ¶

30), in contrast with the reports indicating that force was used "to defend reporting

deputy," "to restrain for subject's safety," "to defend another person," and "to

prevent a forcible, violent felony," (*see*, *e.g.*, ECF No. 111, PageID.1322, 1324,

1326, 1328, 1330).  The Court notes the evidence that:

- At approximately 04:30, several deputies entered Cell 1-E, Steverson (or Peraza) pointed the taser at Plaintiff and threatened him with the taser but did not actually deploy it. (*See* ECF No. 96, ¶¶ 29, 30 [Amended Complaint]; ECF No. 105-1, PageID.1192-1195 [Plaintiff's Deposition]; ECF No. 111, PageID.1316 [Peraza's Jail Incident Report].)

- Plaintiff was again placed in the restraint chair at 04:39:30. (*See* ECF No. 96, ¶ 29; *see also* ECF No. 105-1, PageID.1192 [p. 112].)

- Plaintiff's request "to move the restraint chair back to isolation cell 1-D" was denied, and he "was left in cell 1-E still naked." (ECF No. 96, ¶ 31.)

To be sure, Plaintiff alleges that Peraza's Jail Incident Report is inaccurate (*see* ECF No. 96, ¶ 28), where it states that, "[a]t approximate[ly] 04:30 hours, Annabel covered the cell's camera[,]" (ECF No. 111, PageID.1311, 1316). Similarly, Wetmore's Use of Force Report indicates the "immediacy of danger" was "covering cell camera." (*Id*., PageID.1330-1331.) In contrast, Plaintiff alleges he "was completely naked in a strip-cell with nothing to cover the ceiling-mounted cell camera[,]" (ECF No. 96, ¶ 29), he testified that "[t]he video shows I didn't cover the camera[,]" (*see* ECF No. 105-1, PageID. 1186 [p. 86]; *see also id*., PageID.1192 [p. 112], 1194 [p. 120]), and – when arguing in his response that defense counsel should be held in contempt and/or sanctioned – Plaintiff contends he "was falsely accused of covering the cell's camera as the reason he was placed in the restraint chair . . . ." (ECF No. 111, PageID.1278.) (*See also* ECF No. 111, PageID.1283.)[8]

Whatever may have been the officers' motivation for entering his cell, the Undersigned has viewed both Steverson's BWC dated May 25, 2022 from

---

[8] While not entirely clear as to whether it is necessarily related, among the video exhibits reviewed by the Court is Exhibit 16 (purportedly CCTV from Cell 1-D) where Annabel can be seen using a blanket to strike what appears to be a light in the cell.

04:36:29 to 04:39:43 (SharePoint, Exhibit 9) and Steverson's BWC dated May 25, 2022 from 04:39:45 to 04:41:31 (SharePoint, Exhibit 8) and finds no indication that the force used was excessive.

To the extent Plaintiff's response brief discusses violation of Jail Policy and Procedure JO-59,[9] his complaint alleges a claim of excessive force, not a violation of "due process." (ECF No. 111, PageID.1283-1284.) To the extent Plaintiff notes that the infliction of "gratuitous violence" states a claim, the case upon which he relies alleged that, "without provocation, [defendant Officer] shoved the fully restrained [pretrial detainee Plaintiff's decedent] hard enough that he fell straight down onto cement, powerless to help himself." *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 539 (6th Cir. 2015). (*See* ECF No. 111, PageID.1285.) Here, Steverson's relevant BWC videos (SharePoint Exhibits 8 & 9) do not show "gratuitous strikes towards Plaintiff." (ECF No. 114, PagID.1496.)

---

[9] Plaintiff alleges that Defendants violated the Jail Policy and Procedure concerning use of the restraint chair, seemingly by using the restraint chair for him kicking the door (when it "shall only be used for [controlling] inmates who pose a danger to themselves or others[,]") and by placing him in cell 1-E instead of an observation cell (*e.g.*, cell 1-D). (ECF No. 96, ¶¶ 32-33.) (*See also* ECF No. 111, PageID.1283; *id.*, PageID.1336-1337 [JO-59].) At Plaintiff's August 22, 2022 probable cause hearing for assault of a prison employee (*see* Case No. 22-000795-FY (12th District Court, Jackson)), Steverson was asked, "did you contact the on call doctor[,]" and he responded, "[n]ot that I'm aware of[,]" and "I can't remember." (ECF No. 111-1, PageID.1378.) Steverson was also asked, "why did you choose to use the restraint chair instead of putting him in a suicide suit[,]" and he answered, "I'm not sure." (*Id.*) (*See also* ECF No. 96, ¶ 36.)

### b.      Failure to protect

Second, Plaintiff alleges that that all Defendants were "deliberate[ly] indifferen[t] to his mental health needs by reckless disregard[,]" (ECF No. 96, ¶ 40) and failed to protect him from the use of excessive force (*id*., ¶ 41).  At his deposition, when asked the basis for his deliberate indifference claim against Steverson, Plaintiff answered:  "He knew I was having mental health issues, and he aggravated them worse by showing force they didn't need to show.  And they didn't call no psychologist or psychiatrist to let them know I was having issues." (ECF No. 105-1, PageID.1194 [pp. 117].)  Similarly, Plaintiff's deposition testimony suggests his deliberate indifference claims are based on how a defendant "did not stop the other officers from harassing me or threatening to use force against me[,]" or "never called a psychologist or psychiatrist or had me evaluated." (*Id*. [p.118]; *see also id*., PageID.120, 121, 122.)

The Sixth Circuit has recognized that *Kingsley* "requires modification of the subjective prong of the deliberate-indifference test for pretrial detainees[,]" explaining:

> Mere negligence is insufficient.  A defendant must have not only acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer[ v. Brennan]*, 511 U.S. [825, 836 (1994)] (describing, and rejecting as inapplicable to Eighth Amendment deliberate-indifference claims, the civil standard for

18

recklessness).  A pretrial detainee must prove "more than negligence but less than subjective intent—something akin to reckless disregard." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

*Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 596–97 (6th Cir. 2021).  In the wake of *Brawner*, where a pretrial detainee alleged failure to protect, the Sixth Circuit has applied the following elements to assess the "reckless disregard" standard:

> (1)    The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2)    Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3)    The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4)    By not taking such measures, the defendant caused the plaintiff's injuries.

*Westmoreland v. Butler Cnty., Kentucky*, 29 F.4th 721, 729 (6th Cir. 2022) (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

Applying the *Westmoreland* factors (ECF No. 105, PageID.1148-1149), the Jackson County Defendants contend that Plaintiff's claim fails.  (ECF No. 105, PageID.1148-1151.)  At his deposition, Plaintiff testified that Defendants "didn't protect [him] from the other officers' use of unnecessary force[,]" and "failed to

19

protect [him] from the other officers' abuse." (ECF No. 105-1, PageID.1194-1195 [pp. 120-122].) Yet, his deposition testimony reflects his understanding that, "once you're placed on a suicide watch, they have to do checks every 15 minutes[.]" (ECF No. 105-1, PageID.1182 [p. 70].) And, when he was asked, "Do you have any reason to dispute that they didn't do their checks every 15 minutes while you were on suicide watch while you were in 1-D prior to you moving to 1-E on the 25th[,]" Plaintiff answered, "I would not dispute it because I don't really recall." (*Id*.) Moreover, Plaintiff testified that he usually does "passive-aggressive resistance[,]" meaning he "tense[s] [his] muscles up[,]" and he did not recall whether any of the officers struck him. (*Id*., PageID.1176 [p. 47], 1185 [p. 83], 1186 [p. 87].) He also alleges that, on May 24, 2022, he broke off a piece of metal from a floor restraint in cell 1-D and "used it to scratch himself to induce endorphi[ns], dopamine and serotonin to compensate for being denied medication while on suicide watch[,]" (ECF No. 96, ¶ 20), although he testified that there were "no actual suicide attempts[,]" (ECF No. 105-1, PageID.1181 [pp. 67-68]). And, at his deposition, Plaintiff agreed that he was put in contact with LifeWays on the 23rd and the 25th . . . ." (ECF No. 105-1, PageID.1198 [pp. 135].) Indeed, the attachments to LifeWays Defendant Daniels' motion include inmate contact forms dated May 23, 2022 and May 25, 2022 (ECF No. 126-3), a May 24, 2022 chart

note (ECF No. 126-4), and a medication administration record beginning May 25, 2022 (ECF No. 126-5).

In his response, Plaintiff delineates six (6) arguments – *i.e.*, contempt and/or sanctions, excessive force & deliberate indifference, policy or custom of deliberate indifference, ADA, qualified immunity, and state law tort claims (*see* ECF No. 111, PageID.1277-1293) – none of which expressly addresses his claim for "failure to protect him from" the use of excessive force (*see* ECF No. 96, ¶ 41).  Having reviewed the aforementioned testimony, the evidence does not support a claim that Defendants were deliberately indifferent by failing to prevent the alleged force (*e.g.*, placement in restraint chair or brandishing, but not actually deploying, a taser) or by failing to call a psychologist or psychiatrist or failing to have him evaluated.  *See Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) (in reversing the denial of qualified immunity to a defendant Sergeant, observing that the Sixth Circuit "has never found that pointing a taser, as opposed to actually discharging one, constitutes the use of excessive force.") (internal footnote omitted); *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (regarding allegations of excessive force in responding to a 911 call, "pointing a taser gun at her and using a pressure hold to get her to stand was not a gratuitously violent way to restrain her.").

c.   **Policy or custom (of deliberate indifference, reckless disregard)**

Third, Plaintiff alleges that Defendants had a "policy or custom of deliberate indifference to a substantial risk of . . . harm that they recklessly disregarded and [knew] to exist[.]" (ECF No. 96, ¶ 41.) This claim seems related to Plaintiff's allegations that:

- Defendant Schuette "does not employ a psychologist or psychiatrist at the [JCJ] and merely contracts with LifeWays, Inc., for services only [from] 7:00 a.m. to 4:00 p.m. on Monday-Friday[;]" he "has not ordered the 'antiquated' isolation cells remode[le]d[;]" he does not "inspect [JCJ] operations, whether employees are conforming to policy and procedure, or whether inmates with mental illness are being mistreated[;]" the MDOC performs only one audit per year; and, employee Jail Incident Reports "are not investigated for dishonesty or policy violations, nor are employees disciplined for abusing mentally ill prisoners[,]" (*id.*, ¶ 19); and,

- Defendants violated JCJ policy and procedure (JO-28) and several General Orders (#21, #46, #51), seemingly by not investigating or disciplining any of the Defendants (*id.*, ¶ 34.)

The Jackson County Defendants do not expressly address Plaintiff's "policy or custom" claim within their motion. Still, Plaintiff's responsive argument that Schuette "had a policy or custom of deliberate indifference to the mistreatment and medical needs of mentally ill inmates[,]" (ECF No. 111, PageID.1285-1287), does not establish such a claim. Other than citing cases and making an argument, Plaintiff appears to reference only the following evidence:

- Schuette's February 2024 interrogatory answer: "The [JCJ] contracts with LifeWays to provide mental health services for inmates." (ECF No. 111, PageID.1340.)

- Schuette's October 2024 interrogatory answer: ". . . as of May 2022, Life Ways Jail Clinic[i]ans were only available onsite in [JCJs] from 7:00 a.m. to 4:00 p.m. Monday through Friday." (*Id.*, PageID.1349-1350); and,

- Non-party Captain Stewart's December 13, 2022 state court testimony that the MDOC has "a lot more resources[,]" such as: "They have a psychiatrist. They have psychologists. They have a whole team of indivi -- not to mention they have the cells that are safer for inmate Annabel. Part of the problem we had at the county jail is our jail is so old that our isolation cells are antiquated." (ECF No. 111, PageID.1398-1399; *see also* ECF No. 96, ¶ 18.)

(*Id.*, PageID.1286.)  Plaintiff contends this "caused a delay in Plaintiff receiving medication and ther[a]py for his mental illness[,]" and he also asserts that "[a] couple telephone calls to a distant psychologist and 'antiquated' isolation cells will not suffice." (*Id.*)

Yet, as noted above, Plaintiff agrees he was put in contact with LifeWays on May 23rd and May 25th. (ECF No. 105-1, PageID.1198 [pp. 135]; *see also* ECF No. 126-3, 126-4, 126-5.)  More to the point, "to ensure that these failure-to-train or failure-to-supervise claims do not transform § 1983 into a vicarious-liability statute, the Supreme Court has required plaintiffs to prove two demanding elements[,]" one of which is that "a municipality must have acted with 'deliberate indifference' to the fact that its inadequate training or supervision would lead its

agents to violate constitutional rights." *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 408 (6th Cir. 2022) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)). Plaintiff's cited evidence does not establish that Defendants had a "policy or custom of deliberate indifference to a substantial risk of . . . harm that they recklessly disregarded and [knew] to exist[.]" (ECF No. 96, ¶ 41.) *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

### 3. Discrimination (14th Amendment equal protection) & the ADA (42 U.S.C. §§ 12101-12213)

Plaintiff combines an additional 14th Amendment claim – one based on equal protection – with his ADA claim. Specifically, Plaintiff alleges that Defendant Sheriff Schuette violated his right to equal protection and his ADA rights by "discriminating against him for having more severe disabilities than other inmates who were provided medical treatment services" and "failing to reasonably accommodate him with intent to restrict funding for services and to upgrade jail infrastructure." (ECF No. 96, ¶ 42.) This cause of action appears related to the following allegation:

> Defendant Sheriff Schuette's policies and customs discriminate against persons with more severe mental illness by only providing adequate treatment services to inmates with lesser mental illness and

those with strictly medical disabilities.  Deputies are given license to harass, provoke, and then punish more severely mentally ill inmates for their symptoms and to coerce them to leave the solitude of suicide watch in an isolation cell and deny psychiatric care to them.

(ECF No. 96, ¶ 37.)

Preliminarily, while the source for Plaintiff's equal protection claim is obvious (*i.e.*, the Fourteenth Amendment), Plaintiff's pleading does not cite the section of the ADA upon which his discrimination claim is based.  Nonetheless, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  "To establish a prima facie case under the ADA, a plaintiff must show that:  (1) he has a disability; (2) he is otherwise qualified; and (3) he is being excluded from participating in, being denied the benefits of, or being subjected to discrimination under the program solely because of his disability."  *Vick v. Core*

*Civic*, 329 F. Supp. 3d 426, 441 (M.D. Tenn. 2018) (*citing Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015)).

In their motion, the Jackson County Defendants contend that courts in the Sixth Circuit and other circuits have routinely rejected "claims based upon nothing other than inadequate medical care." (ECF No. 105, PageID.1156.) *See*, *e.g.*, *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("the Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged[.]"); *Stevens v. Hutchinson*, No. 1:13-CV-918, 2013 WL 4926813, at *4 (W.D. Mich. Sept. 12, 2013) ("The failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation.") (referencing *Bryant*); *Vick*, 329 F. Supp. 3d at 444 ("[T]he bare allegation of inadequate medical care, even when made by a person with a serious disability, does not state a claim under the Rehabilitation Act. Put another way, the Plaintiff is claiming that he was not properly treated for his diabetes, not that he was mistreated because of his diabetes. This claim falls squarely under the Eighth Amendment of the United States Constitution . . . ."); *Bonds v. S. Health Partners, Inc.*, No. 2:15-CV-209-WOB, 2016 WL 1394528, at *6 (E.D. Ky. Apr. 6, 2016) ("the ADA . . . afford[s] disabled persons legal rights regarding access to programs and activities enjoyed by all, but [this statute does] not provide a general federal

cause of action to challenge the sufficiency of the medical treatment of their underlying disabilities.") (citation omitted); and, *Winburn v. Davis*, No. 08-14996, 2009 WL 3004555, at *5 (E.D. Mich. Sept. 16, 2009) ("Plaintiff complains about incompetent medical treatment.  The ADA does not create a remedy for medical malpractice.  The Act is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.").

To the extent Defendants contend that Plaintiff's ADA claim "constitute[s] nothing more than generic medical malpractice and/or generic conditions of confinement claims, not ADA liability[,]" (ECF No. 105, PageID.1158-1159), or to the extent they suggest that Plaintiff's ADA claim "alleges nothing other than inadequate medical care[,]" (ECF No. 114, PageID.1501), the pleading expressly alleges "discrimination," (ECF No. 96, ¶¶ 37, 42).  As Plaintiff argues, his claim is for "disparate treatment and failure to make reasonable accommodations."  (ECF No. 111, PageID.1287-1288.)  *See Mingus v. Butler*, 591 F.3d 474, 483 (6th Cir. 2010) (finding that plaintiff had alleged misconduct that independently violated Title II of the ADA and the Fourteenth Amendment where "the gravamen of his complaint is that he was treated differently than similarly situated prisoners or prisoners with fewer, or less serious, disabilities with no rational basis underlying the disparate treatment.") (citing *United States v. Georgia*, 546 U.S. 151, 159 (2006)).

Nonetheless, the Jackson County Defendants are entitled to dismissal of Plaintiff's 14th Amendment / ADA discrimination claim (*see* ECF No. 96, ¶ 42). Where they contend that "the record is devoid of any details regarding any discriminatory animus by Sheriff Schuette, or any jail staff, let alone any allegations he was treated differently than other similarly situated inmates[,]" or that "there is nothing within the factual allegations or discovery to suggest he was ever discriminated against *because* of his disability[,]" (ECF No. 105, PageID.1158; ECF No. 114, PageID.1501 (emphasis in original)), the Jackson County Defendants convincingly point to Plaintiff's December 4, 2024 deposition testimony that he "had no direct interactions with [Schuette][,]" (ECF No. 105-1, PageID.1192 [pp. 109-111]), as well as the following exchange:

> Q:     But these claims that you need discovery on, that's your ADA claim that was part of your original complaint, right?
>
> A:     I believe so.
>
> Q:     So you've already had an opportunity to ask questions on it, you just didn't.
>
> A:     I guess.

(ECF No. 105-1, PageID.1198 [pp. 133-134].)  (*See* ECF No. 105, PageID.1158.)

By comparison, Plaintiff's response does not point to evidence; it just cites cases and employs argument.  (*See* ECF No. 111, PageID.1287-1288.)

Specifically, Plaintiff contends "[i]t was disparate treatment that inmates with fewer or less serious medical disabilities received face-to-face evaluations by a medical doctor but that Schuette did not have the face-to-face evaluation of a psychiatrist on duty at the jail[,]" which "caused a delay in Plaintiff receiving psychotropic medications and resulted in prolonged isolation in an observation cell." (*Id.*, PageID.1288.)  However, these assertions – along with Plaintiff's assertion that Defendants "also failed to make reasonable accommodations" by "not employing an on duty psychologist or psychiatrist" and "not renovating the 'antiquated' observation cells for the safety of mentally ill inmates," (*id.*, PageID.1288) – are, without record support, unsubstantiated.  Even if Plaintiff is referring to non-party Captain Stewart's December 13, 2022 state court testimony that the MDOC has "a lot more resources[,]" (*see* ECF No. 111, PageID.1398-1399), such as a psychiatrist, psychologists, safer cells, there is record evidence that establishes the existence of at least some mental health services at JCJ, such as Schuette's interrogatory answer, "[t]he [JCJ] contracts with LifeWays to provide mental health services for inmates[,]" (ECF No. 111, PageID.1340).

Because the evidence does not show that he is being denied "the equal protection of the laws[,]" U.S. Const. amend. XIV, or that Defendants are discriminating against him solely due to the severity of his mental illness, the

Jackson County Defendants are entitled to summary judgment on Plaintiff's equal protection / ADA discrimination claim.

### 4.    Qualified immunity

The Jackson County Defendants contend that "the record also supports the conclusion that [they] are shielded by qualified immunity."  (ECF No. 105, PageID.1151-1155; *see also* ECF No. 114, PageID.1499-1500.)  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Entitlement to qualified immunity involves a two-part inquiry, namely "whether a constitutional right would have been violated on the facts alleged[,]" and, "whether the right was clearly established . . . [,]" which "must be considered on a more specific level than recognized by the Court of Appeals."  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

In his response, Plaintiff argues that Defendants "are not entitled to the affirmative defense of qualified immunity."  (ECF No. 111, PageID.1288-1290.) However, if the Court agrees with the foregoing recommendations that the Jackson County Defendants are entitled to summary judgment as to Plaintiff's federal constitutional and statutory claims, then it need not reach the question of whether the Jackson County Defendants are entitled to the defense of qualified immunity.

### 5.    State law

Plaintiff's state law causes of action include intentional infliction of emotional distress & gross negligence (as to all Defendants), as well as assault and battery & invasion of privacy (as to Steverson, Sibson, Wetmore, and Peraza). (ECF No. 96, ¶¶ 43, 44, 45, 46.)  Defendants argue for dismissal of Plaintiff's "gross negligence claim and state law intentional tort claims . . . [,]" citing Mich. Comp. Laws § 691.1407, various cases, and Plaintiff's deposition testimony.  (ECF No. 105, PageID.1159-1161; ECF No. 105-1, PageID.1196 [p. 125]; ECF No. 114, PageID.1501-1502.)  Plaintiff argues that his "state law tort claims should not be dismissed[,]" citing a multitude of case law and, *inter alia*, video evidence.  (ECF No. 111, PageID.1290-1293.)  However, if the Court agrees with the foregoing recommendations that the Jackson County Defendants are entitled to summary judgment as to Plaintiff's federal constitutional and statutory claims, then the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims, as permitted by 28 U.S.C. § 1367(c)(3).

### E.    Conclusion

As set forth in detail above, the Court should **GRANT** the Jackson County Defendants' motion for summary judgment (ECF No. 105) with prejudice as to all federal claims and without prejudice as to Plaintiff's right to re-file in state court as to his state law claims.

## III.   PROCEDURE ON OBJECTIONS (WARNING: <u>Shortened Period for responding to objections</u>)

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within **14 days** of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc*.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  **<u>In this case, the Court exercises its discretion to shorten the period to responding to objections;</u>** therefore, not later than **7 days** after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to

Objection No. 1," "Response to Objection No. 2," *etc*.  If the Court determines that

any objections are without merit, it may rule without awaiting the response.


Dated:  September 2, 2025

_____
Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE